UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RETAIL BRAND ALLIANCE, INC.,

                          Plaintiff,

-against-                                05 Civ. 1031 (RJH)

**MEMORANDUM OPINION
AND ORDER**

FACTORY MUTUAL INSURANCE CO.,

                          Defendant.

       This case concerns business interruption coverage for three stores destroyed in the terrorist attack on the World Trade Center on September 11, 2001 ("9/11"). On January 31, 2005, plaintiff Retail Brand Alliance Inc. ("RBA") filed a complaint against its insurer, Factory Mutual Insurance Co. ("FM Global"), seeking in part a declaratory judgment that RBA is entitled to coverage for business income for the period of time it reasonably would take to replace its stores in a rebuilt World Trade Center complex. (Compl. 34–39.) FM Global denied RBA's allegations, stating that it had already paid a total of $3,886,940 for RBA's property damage and time element claim.[1] (Answer 6.) Following discovery, the parties moved for partial summary judgment, each side seeking a ruling in favor of its preferred interpretation of the Policy. For the reasons stated herein, the Court denies plaintiff's motion for partial summary judgment [27] and grants defendant's motion for partial summary judgment [21].

---

[1] Time element coverage reimburses the insured for losses directly related to the period of time necessary to restore the damaged property to its normal condition. Examples of time element coverage include business interruption insurance, contingent business interruption insurance, and extra expense insurance. *See* Stephen A. Cozen, *Insuring Real Property* § 3.01 (2005).

**BACKGROUND**

Prior to September 11, 2001, RBA operated three retail stores (the "Stores") in the World Trade Center in New York. Those three stores—Casual Corner, Petite Sophisticate, and August Max—were part of a chain of approximately 650 women's clothing stores spread across the United States. The three stores at issue here were in the multilevel underground mall in the WTC complex. Each day, tens of thousands of workers and other commuters walked through the enclosed mall past the Stores on their way to and from work and the subway and PATH trains. Because a large percentage of those who worked in the World Trade Center were young career women, RBA's primary target consumers, RBA's stores in the World Trade Center were significantly more profitable than any of its other stores.

RBA purchased property and business interruption insurance for the Casual Corner, Petite Sophisticate, and August Max Woman brand stores nationwide through FM Global, under policy number NB334 (the "Policy"). (*See* Hennen Decl. Ex. A.) The Policy also covers a variety of other properties as well, including other retail brand stores, warehouses, storage facilities, factories, and corporate centers. (*See* Policy, App. A; Def.'s Mem. in Support of Its Motion for Partial Summ. J. ("Def.'s Mot.") 1–2.) A list of specific locations covered by the Policy are included in Appendix A, titled "Schedule of Locations." Although the Casual Corner, Petite Sophisticate, and August Max Woman brand stores are not explicitly described in the Policy, Appendix A notes that coverage is provided for a "Schedule of Retail Stores on file with this Company" ("Schedule"). (*See* Policy, App. A (Revised), at 1.) The Schedule, which constantly changed as RBA opened and closed stores, listed the Stores at issue here, as well as the hundreds of other retail stores operated by RBA under the Casual Corner, Petite Sophisticate, and August Max Woman brands. (See Schedule, Hennen Decl. Ex. C; Def.'s Mot. 2.)

The Policy covers property and business interruption losses at all RBA stores for the period between February 1, 2001, and February 1, 2002, and has a blanket limit of $647 million for property and business interruption losses.  The policy provides "TIME ELEMENT" coverage as follows:

1. LOSS INSURED

   A. This Policy insures TIME ELEMENT loss, as provided in the TIME ELEMENT COVERAGES, directly resulting from physical loss or damage of the type insured by this Policy:

      1) to property described elsewhere in this Policy and not otherwise excluded by this Policy or otherwise limited in the TIME ELEMENT COVERAGES below;

      2) used by the Insured, or for which the Insured has contracted use;

      3) located at an Insured Location; and

      4) during the Periods of Liability described in this section.

   B. This Policy insures TIME ELEMENT loss only to the extent it cannot be reduced through:

      1) the use of any property or service owned or controlled by the Insured;

      2) the use of any property or service obtainable from other sources;

      3) working extra time or overtime; and

      4) the use of inventory

      all whether at an Insured Location or at any other location.  The Company reserves the right to take into consideration the combined operating results of all associated, affiliated, or subsidiary companies of the Insured in determining the TIME ELEMENT loss.

   . . . .

(Policy § C.1, at 25.)  The provision dealing with business interruption losses extends coverage to "the recoverable GROSS EARNINGS loss," which the Policy defines as "Gross Earnings; less all charges and expenses that do not necessarily continue during the

3

interruption of production or suspension of business operations or services; less Ordinary Payroll; plus all other earnings derived from the operation of the business." (Policy § C.2.A.1.a, at 25–26.) The Policy also extends coverage for certain "EXTRA EXPENSE" incurred as a result of physical loss or damage insured by the Policy. (Policy § C.2.B, at 26–27.) Gross earnings and extra expense coverage do not extend into the indefinite future but are limited by the Period of Liability clause, which provides in relevant part as follows:

    4. PERIOD OF LIABILITY

        A. The PERIOD OF LIABILITY applying to all TIME ELEMENT COVERAGES, except LEASEHOLD INTEREST and as shown below, or if otherwise provided under the TIME ELEMENT COVERAGE EXTENSIONS, is as follows:

        1) For building and equipment, the period:

          a) starting from the time of physical loss or damage of the type insured against; and

          b) ending when with due diligence and dispatch the building and equipment could be:

            (i) repaired or replaced; and

            (ii) made ready for operations,

        under the same or equivalent physical and operating conditions that existed prior to the damage.

          c) not to be limited by the expiration of this Policy.

    . . . .

(Policy § C.4, at 34.)

    The principal coverage issue presented by the instant motions concerns how these clauses should be interpreted in determining the length of the Period of Liability applicable to RBA's World Trade Center stores. Specifically, RBA seeks partial summary judgment that the Period of Liability is "the theoretical period of time reasonably necessary, with due diligence and

dispatch, to replace the Stores and make them ready for operations at a location with a sales environment that is comparable to the one which existed at the WTC shopping mall before 9/11." (Pl.'s Mem. in Support of Cross-Motion for Partial Summ. J. and Opp'n ("Pl.'s Opp'n") 2; *see also* Oral Argument Tr. 10, 13, 19 (May 2, 2007) ("Tr.") ("[W]hat we're saying is we are entitled to get a period of time in order to reconstitute these stores at a commercially comparable location," that is, a location with approximately the same "flow of foot traffic by the door.").) RBA further seeks a ruling that if no such comparable alternative location exists, as it indeed contends, it is entitled to business interruption coverage for the hypothetical time necessary to rebuild the World Trade Center. (Pl.'s Opp'n 2; Tr. 22.) FM Global, by contrast, seeks partial summary judgment that the Period of Liability is the hypothetical period of time in which RBA would be able to replace its World Trade Center stores with "reasonably equivalent store[s] in a reasonably equivalent location."[2] (Def.'s Mot. 12; Tr. 28, 32, 33, 34, 41); *see Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 393 (2d Cir. 2005).

## DISCUSSION

**I.     Legal Standard**

Under Federal Rule of Civil Procedure 56(c), the burden is on the party moving for summary judgment to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *White v. ABCO Engineering Corp.*, 221 F.3d 293, 300 (2d Cir. 2000). Once the moving party has met its burden, to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 255. "The

---

[2] The parties agree that the Period of Liability is the hypothetical (as opposed to actual) time frame for rebuilding the stores. (*See* Def.'s Mot. 12; Pl.'s Opp'n 2.)

5

plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986); *see also Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir. 1998); *Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 458 (S.D.N.Y. 2006).

"With respect to a contract claim, a court may construe the contract and grant summary judgment when the contractual language is 'plain and unambiguous.'" *Zurich Am. Ins. Co. v. ABM Indus., Inc.*, 397 F.3d 158, 164 (2d Cir.2005) (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 148–49 (2d Cir.1993)). The Second Circuit has held that

> an ambiguity exists where the terms of an insurance contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Id.* (quoting *Morgan Stanley Group Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000)). The question of ambiguity is a question of law to be decided by the Court. *See Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002); *Readco v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir. 1996). Absent ambiguity in the policy, the Court will not look to extrinsic evidence, but will interpret the contract on its face, giving the words their ordinary meaning. *See Kinek v. Paramount Communications, Inc.*, 22 F.3d 503, 509 (2d Cir. 1994). Each word should be given the meaning ordinarily ascribed to it, and "absurd results should be avoided." *World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 166 (2d Cir. 2003).

**II.     Textual Analysis**

As noted, the Period of Liability for business interruption coverage ends when RBA's building and equipment could be replaced and made ready for operations "under the same or

6

equivalent physical and operating conditions." (Policy § C.4.A.1.b, at 34.) The entire dispute between the parties turns on the interpretation of the quoted phrase, or, more precisely, the last two words of the phrase. RBA contends that the relevant "operating conditions" include "the location of the store, in particular, the access to a certain flow of foot traffic by the door." (Tr. 10.) Since RBA further contends that the foot traffic past its stores in the World Trade Center concourse was unique, RBA argues that the Period of Liability would be the hypothetical time it would take to replace its stores in a rebuilt World Trade Center complex. (*See* Tr. 12–13; Pl.'s Opp'n 3–4.) RBA argues that, because the Time Element coverage protects loss to its *business*, as opposed to its *property*, the phrase "under the same or equivalent physical and operating conditions" refers to the operating conditions of its business, not merely the operating conditions of its building and equipment. (Tr. 9–10.)

     The Court finds that the unambiguous language of the Period of Liability clause precludes RBA's interpretation. The phrase "under the same or equivalent physical and operating conditions" explicitly modifies "building and equipment"; the word "business" does not even appear in that part of the Period of Liability clause at dispute here. (*See* Policy § C.4.A.1, at 34.) RBA argues that if the word "business" is not read into the clause, then the phrase "under the same or equivalent physical and operating conditions" becomes superfluous because the clause already states that coverage extends until the repaired or replaced "building and equipment" are "made ready for operations." (Tr. 38; Pl.'s Opp'n 17.) However, replacing and making a building and equipment ready for operations and ensuring that the building and equipment operate in a manner equivalent to their operation prior to their loss are two different things. The equivalent operating condition provision explicitly requires that repaired or replaced facilities have the same capacities as the damaged facilities. Moreover, even after a store and its

7

systems are rebuilt with the same operating capacities, it may take time to adjust, for example, the heating, ventilation, and air conditioning system so that it works correctly in the new building. It would be nonsensical to interpret the Period of Liability as extending until the building and equipment are restored to the same "sales environment" or "profit-earning potential," as these conditions are irrelevant to the operation of building and equipment. Instead, the Policy reimburses the insured for Gross Earnings and Extra Expenses during the period in which the building and equipment are being made ready to operate in the same manner that they did prior to the damage that triggered coverage. Once the building and equipment are restored to that state, the Period of Liability ends.

Because the Period of Liability is tied to the condition of the insured's building and equipment, and not to the condition of its business, the Period of Liability may terminate while the insured is still losing sales. In such cases, the Extended Period of Liability in RBA's policy provides additional coverage to the insured. Under this provision, "The GROSS EARNINGS coverage is extended to cover the reduction in sales . . . for such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's *business* [as opposed to the Insured's building and equipment] to the condition that would have existed had no loss occurred." (Policy § C.3.C.1–2, at 30 (emphasis added).) Thus, the Period of Liability is concerned with the condition of the "building and equipment," while the Extended Period of Liability is concerned with the condition of the business.[3]

---

[3] Further support for the Court's interpretation of the Period of Liability clause is found in the Contingent Time Element—Anchor Stores clause. (*See* Policy 30.) The Anchor Stores clause provides contingent business interruption coverage during the Period of Liability when an anchor store, whose business is necessary to attract customer traffic to the insured's establishment, suffers physical damage. Anchor Store coverage is capped at twelve months and twenty percent of normal sales. *Id.* If, as RBA argues, the Period of Liability extends until the sales environment that existed prior to the loss is restored, then in a situation in which the insured's

### III.     Relevant Case Law

Although no other case involving World Trade Center tenants has analyzed precisely the same language at issue here, the cases generally support the conclusion reached by the Court, that the Period of Liability is tied to the restoration of the insured's building and equipment, and not to the original location of that building or the surrounding sales environment.  Other cases in which the insured operated a retail store damaged or destroyed on 9/11 have uniformly rejected attempts to tie the period of liability to rebuilding of the World Trade Center.  *See Duane Reade*, 411 F.3d 384 (drugstore in World Trade Center's main concourse) ; *Children's Place Retail Stores v. Fed. Ins. Co.*, 829 N.Y.S.2d 500 (N.Y. App. Div. 2007) (clothing store in World Trade Center's main concourse); *Royal Indemnity Co. v. Retail Brand Alliance*, 822 N.Y.S.2d 268 (N.Y. App. Div. 2006) (Brooks Brothers clothing store at One Liberty Plaza).  Courts also have rejected similar attempts by non-retail businesses where the purpose of the business was not tied to the real property at the World Trade Center.  *See Lava Trading Inc. v. Hartford Fire Ins. Co.*, 365 F. Supp. 2d 434 (business sold software for equities trading); *Streamline Capital, LLC v. Hartford Cas. Ins. Co.*, 2003 WL 22004888 (business provided securities traders, brokers, and dealers with technological and computer management facilities in the World Trade Center). Indeed, in each of the three cases in which courts held that the scope of business interruption coverage *was* tied to the rebuilding of the World Trade Center, the insured's business depended on the existence of the real property at the World Trade Center.  *See Zurich Amer. Ins. Co. v. ABM Indus., Inc.*, No. 01 Civ. 11200 (JSR), 2006 U.S. Dist. LEXIS 28249, 2006 WL 1293360,

---

property and the anchor store are simultaneously destroyed and the anchor store is not rebuilt, business interruption coverage might extend until the hypothetical time it would take to rebuilt the anchor store.  This result is plainly absurd because it would vitiate the twelve-month, twenty-percent cap on Anchor Store coverage dictated by the Policy.  RBA's interpretation of the phrase "operating conditions" to include the sales environment (i.e., foot traffic) thus conflicts with the Anchor Store clause.

9

at *2 (S.D.N.Y. May 11, 2006) (business provided janitorial, lighting and engineering services throughout the World Trade Center complex); *Int'l Office Ctrs. Corp. v. Providence Washington Ins. Co.*, No. 04 Civ. 990 (JCH), 2005 U.S. Dist. LEXIS 20494, 2005 WL 2258531 (D. Conn. Sept. 16, 2005) (business provided temporary executive office space in the World Trade Center); *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props.*, No. 01 Civ. 9291 (MBM), 2005 U.S. Dist. LEXIS 13001, 2005 WL 827074 (S.D.N.Y. Feb. 15, 2005) (business owned 99-year leases with the Port Authority of New York and New Jersey for the commercial space in the World Trade Center complex).  Here, RBA's business was clearly not dependent on the existence of the World Trade Center complex, as demonstrated by the hundreds of stores it operated across the country.

The case that is most similar to RBA's situation is *Duane Reade*, 411 F.3d at 389–90. Duane Reade, which owns more than 200 drugstores in and around New York City, operated its most profitable store in the World Trade Center concourse, on the same floor as RBA's stores. The time period clause limiting business interruption insurance under its policy provided that recovery of business interruption losses "shall not exceed such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair, or replace such property that has been destroyed or damaged . . . ."  *Id.* at 387.  At the Second Circuit, Duane Reade defended the district court's conclusion that the period of liability for its business interruption coverage was to be measured by the hypothetical time frame for the rebuilding of the WTC store itself, although not the entire complex, on the ground that "the parties intended to protect Duane Reade's interest in the specific location of its valuable WTC store."  *Id.* at 394. The court found, however, that to the extent that Duane Reade had a site-specific property interest in the World Trade Center complex, that property interest was protected by the leasehold

interest clause in Duane Reade's policy. *Id.* at 397–98. The leasehold interest clause in Duane Reade's policy—like the leasehold interest in RBA's policy—entitled Duane Reade, in the event that its leasehold interest was terminated as a result of the destruction of its leased premises in the World Trade Center by a covered peril, to reimbursement for the loss of the site's "actual rental value (i.e., its intrinsic value) less the rents and expenses Duane Reade would have had to pay, but only until the lease would have expired of its own accord." *Id.* at 397. Once Duane Reade's business had resumed in a "reasonably equivalent building in a reasonably equivalent location," the Second Circuit said, "any discrepancies between the new building and the WTC in terms of benefits and advantages [of the site itself] are exclusively accounted for under the Leasehold Interest clause," if at all. *Id.* at 394, 398. The Second Circuit also rejected Duane Reade's claim that the business interruption clause provided site-specific coverage because the site that Duane Reade occupied in the World Trade Center "was neither the subject of the insurance policy nor expressly provided for in the calculus set forth in the Restoration Period," *id.* at 396, "as might be expected had the parties intended to single out the WTC store in a policy that covered all of Duane Reade's 200 stores," *id.* at 395.

The Court finds that the Second Circuit's reasoning in *Duane Reade* applies in the present case. The Court notes that the language of the Period of Liability for business interruption under RBA's policy is identical to that in Duane Reade, except for the provision that the building and equipment be repaired or replaced under the "same or equivalent physical and operating conditions." As the Court has found, this phrase does not create a requirement for an equivalent flow of foot traffic. Accordingly, any interest RBA has in the "increased foot traffic, entrenched customer base, or superior location" enjoyed by its Stores at the World Trade Center was not protected by the business interruption clause. *Id.* at 397–98. Like Duane Reade, RBA's

interest in the unique location of its Stores was protected, if at all, by the Leasehold Interest clause in its Policy, which is identical in scope to the leasehold interest clause in Duane Reade's policy. (*Compare* Policy § C.2.C, at 27 *with Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, No. 02 Civ. 7676 (JSR), Pl.'s Mot. for Summ. J., Benkard Aff. [56] Ex. A (Policy), at 17.)

Although RBA's World Trade Center stores are listed on a schedule that is referred to in Appendix A of the Policy, RBA concedes that the Stores are not "specifically named" in the policy. (See Pl.'s Letter, Jan. 19, 2007, at 1.) RBA argues that the only reason for their omission from the Policy itself is that the list of insured locations is too long to be included in the Policy's declaration page. Even if this is true, and the Court assumes that it is, it does not support RBA's proposition that the Policy extends business interruption coverage until the time when its Stores are rebuilt on their original location. As the Court has already found, the Period of Liability clause does not tie coverage to the site-specific restoration of each of RBA's 650 store locations. Thus, despite the fact that RBA's policy, unlike Duane Reade's policy, refers explicitly to a list of insured locations in a Schedule filed with FM Global, nothing in the Policy suggests that RBA sought to single out the World Trade Center Stores, or indeed any of its stores, for site-specific coverage. Rather, like the policy in *Duane Reade*, the Policy is a general one that covers hundreds of retail stores and contemplates the possibility that stores will be rebuilt in new locations.

The Court notes, however, that business interruption coverage does not terminate under RBA's policy when its Stores are rebuilt in any generic location. The Second Circuit has found implicit in provisions similar to that here a requirement that coverage continue until the insured can build a "reasonably equivalent store in a reasonably equivalent location." *Duane Reade*, 411 F.3d at 393 (citing *Beautytuft, Inc. v. Factory Ins. Ass'n*, 431 F.2d 1122, 1128 (6th Cir. 1970);

12

*Anchor Toy Corp. v. Am. Eagle Fire Ins. Co.*, 155 N.Y.S.2d 600, 603 (N.Y. Sup. Ct. 1953)).

"The rationale behind such holdings has generally been that insureds would lack any incentive to resume partial operations in temporary locations or under other inferior circumstances in order to mitigate damages if such actions would terminate their [business interruption] coverage." *Id.* Moreover, FM Global agreed at oral argument that, at least in this Circuit, coverage under the Policy extends until RBA can build a "reasonably equivalent store in a reasonably equivalent location." (Tr. 28, 32, 33, 34, 41.) While RBA contends that the Second Circuit's definition of the period of coverage in *Duane Reade* is not applicable to the instant policy, RBA has at times advocated a similar approach. Thus, at argument RBA contended that coverage should extend for "a period of time in order to reconstitute these stores at a commercially comparable location, where there is a comparable access to potential clients." (Tr. 13.) Without attempting to define the precise difference between a "commercially comparable" location and a "reasonably equivalent" one, the Court adheres to the Circuit's definition of the period of liability.[4]

---

[4] Having found that the Policy language is unambiguous and is supported by case law, the Court need not consider extrinsic evidence submitted by the parties. *See Lava Trading*, 365 F. Supp. 2d at 440.

## CONCLUSION

In accordance with the foregoing, the Court holds that the Period of Liability extends time element coverage under the Gross Earnings and Extra Expense clauses until RBA can build reasonably equivalent stores in a reasonably equivalent location, but that this period is not tied to the hypothetical time that it would take to rebuild its Stores in a rebuilt World Trade Center complex. Accordingly, the Court denies plaintiff's motion for partial summary judgment [27] and grants defendant's motion for partial summary judgment [21].

SO ORDERED.

Dated: New York, New York
      May 30, 2007

                                              Richard J. Holwell
                                              United States District Judge